UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA and
COMMONWEALTH OF
MASSACHUSETTS ex rel. CARMEN
CORREA and JULIO ESCOBAR

     Relators-Plaintiffs,

v.

UNIVERSAL HEALTH SERVICES, INC.,
UHS OF DELAWARE, INC., and HRI
CLINICS, INC.

     Defendants.

## COMPLAINT

Qui tam relators Carmen Correa and Julio Escobar ("Relators"), on behalf of the
United States of America and the Commonwealth of Massachusetts, bring this action
against Defendants Universal Health Services, Inc., UHS of Delaware, Inc., and HRI
Clinics, Inc., (together, "UHS"), pursuant to the federal False Claims Act, 31 U.S.C.
§ 3729 *et seq.*, and the Massachusetts False Claims Act, M.G.L. Chapter 12, § 5A *et seq.*, to
recover damages and penalties resulting from Defendants' improper billing to the
Massachusetts Medicaid program, MassHealth, for mental health services.   The claims
were paid by Massachusetts Behavioral Health Partnership ("MBHP") and Managed
Care Organizations ("MCOs"), but were paid with funds provided by the United States
and the Commonwealth of Massachusetts.

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

PARTIES ...........................................................................................................................2

JURISDICTION AND VENUE.........................................................................................3

THE RELATIONSHIPS BETWEEN UNIVERSAL, UHS OF DELAWARE, INC. AND
HRI, AND THEIR CONTROL OF ARBOUR .................................................................4

REGULATORY AND CONTRACTUAL FRAMEWORK.................................................8

A. MassHealth and Payment Systems for MassHealth Beneficiaries....................................8

B. Payment of Behavioral Health Services of MassHealth Beneficiaries Through
Massachusetts Behavioral Health Partnership ("MBHP") .....................................................11

C. MassHealth Regulations for Provision of Behavioral Health Services ..........................13

D. Other Massachusetts Agency Regulations .....................................................................20

E. MBHP and MCOs Licensing and Supervision Requirements
Through Credentialing..........................................................................................................22

F. Claims Submission to MBHP and MCOs.......................................................................29

G. MassHealth and Other Massachusetts Regulations for Provision of Behavioral Health
Services Apply to Services Paid for by MBHP and MCOs ...................................................30

H. MassHealth Service Codes and Descriptions .................................................................32

FACTUAL ALLEGATIONS .............................................................................................34

STATE INVESTIGATIONS OF THE STAFFING AT ARBOUR CLINICS CONFIRMS
RELATORS' ALLEGATIONS THAT UHS ROUTINELY PRESENTED CLAIMS TO
MASSHEALTH FOR SERVICES PERFORMED BY INELIGIBLE MENTAL HEALTH
CLINICIANS.......................................................................................................................42

UHS CAUSED FALSE CLAIMS TO BE PRESENTED TO MASSHEALTH .....................53

A. UHS Knowingly Presented False Claims to MBHP and MCOs for Services Rendered
to MassHealth Beneficiaries by Unlicensed Social Workers and Mental Health
Counselors Who Were Not Properly Supervised or Qualified .............................................53

i

B. UHS Presented False Claims to MBHP and MCOs for Medication Management and Prescription Medications Prescribed by Psychiatric Nurses Who Were Not Properly Supervised by a Qualified Psychiatrist...................................................................................66

C. UHS Presented False Claims to MBHP and MCOs for Services Rendered to MassHealth Beneficiaries That Were Performed by an Unlicensed, Unsupervised, and Unqualified Psychologist.....................................................................................................70

D. UHS Presented False Claims to MBHP and MCOs for Services Rendered to MassHealth Beneficiaries That Were Performed by an Unqualified and Unsupervised Psychiatrist............................................................................................................................74

COUNT ONE 31 U.S.C. § 3729(a)(1)(A) FALSE CLAIMS.....................................................76

COUNT TWO 31 U.S.C. § 3729(a)(1)(B) FALSE STATEMENTS.........................................77

COUNT THREE MASSACHUSETTS FALSE CLAIMS M.G.L. C. 12 § 5(B)(1) ................78

COUNT FOUR MASSACHUSETTS FALSE STATEMENTS M.G.L. C. 12 § 5(B)(2).........79

CONCLUSION............................................................................................................................80

## INTRODUCTION

1.      The allegations in this Complaint arise out of UHS's routine practice of billing of mental health services by unlicensed, unqualified, and unsupervised employees. UHS billed for these services at its Lawrence, Massachusetts mental health center in clear violation of several express requirements of MassHealth, the Massachusetts Medicaid program, and the requirements of persons who contracted with MassHealth to administer the payment of mental health benefits for MassHealth beneficiaries: MBHP and the various MCOs. UHS had full knowledge of these violations and facilitated them with false statements, yet billed MBHP and MCOs anyway, as if the services had been provided by qualified and properly supervised mental health professionals in full compliance with MassHealth regulations. Relators discovered these false and fraudulent billing practices from their own investigation into the death of their daughter, Yarushka Rivera ("Yarushka"), a 17-year-old high school student who received gravely inadequate treatment from UHS's unsupervised and unqualified personnel at the Arbour Counseling Services ("Arbour") facility in Lawrence. Relators discovered that UHS's failure to comply with licensing and supervision requirements was not limited to the individuals who provided services to their daughter, and that UHS's scheme to improperly bill MBHP and MCOs was facilitated by false statements. Moreover, although UHS's knowing disregard of the licensing, qualification and supervision requirements had been in effect before UHS began to deliver services to Yarushka in 2007, the policies and practices at UHS that

resulted in the submission of false claims for Yarushka's treatment continued in effect

until at least 2013, and to the best of Relators' knowledge, continued well after that time.

## PARTIES

2.      Plaintiff-Relators Carmen Correa and Julio Escobar (collectively, the

"Relators"), are married and reside in Methuen, Massachusetts.  Yarushka is the late

daughter of Carmen Correa and the step-daughter of Julio Escobar.  At all times

relevant to this Complaint, Yarushka was a recipient of MassHealth insurance benefits

paid for by MBHP.

3.      Defendant Universal Health Services, Inc., ("Universal"), is a for-profit

Delaware corporation which does business in Massachusetts and has a principal place

of business at 367 Gulph Road, King of Prussia, PA 19406.

4.      Defendant UHS of Delaware, Inc., is a for-profit Delaware corporation

which does business in the state of Massachusetts, and has a principal place of business

at 367 Gulph Road, King of Prussia, PA 19406.  UHS of Delaware, Inc. is a wholly

owned subsidiary of Universal.

5.      Defendant HRI Clinics, Inc., ("HRI") is a for-profit Massachusetts

corporation doing business in Massachusetts, with a principal place of business located

at 367 South Gulph Road, King of Prussia, PA 19406.  HRI is a wholly owned subsidiary

of Universal.

6.      As described below, UHS owns, operates and manages counseling

facilities throughout eastern Massachusetts including:  Arbour Counseling Services,

Allston; Arbour Counseling Services, Jamaica Plain; Arbour Counseling Services, Fall

River; Arbour Counseling Services, Franklin; Arbour Counseling Services, Haverhill ("Arbour Haverhill"); Arbour Counseling Services, Lawrence ("Arbour Lawrence"); Arbour Counseling Services, Lowell; Arbour Counseling Services, Norwell; Arbour Counseling Services, Woburn; Arbour Counseling Services, Malden ("Arbour Malden"); and Arbour Counseling Services, Worcester. Collectively, these UHS owned Massachusetts based entities are referred to as "Arbour." The Arbour counseling centers are all mental health centers, as that term is defined by MassHealth at 130 CMR 429.402. At all relevant times, Arbour Lawrence was a "satellite" of Arbour Malden.

7.      During most of the relevant time period, Arbour Malden was the main, or parent center,[1] and the other Arbour Counseling entities were satellite facilities of Arbour Malden.[2]

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. This court also has supplemental jurisdiction over the Commonwealth of Massachusetts claims that arise from the same transaction or occurrence.

---

[1] In 2013, the parent center located in Malden was moved to a new location in Medford. For the sake of clarity, this center will still be referred to as Arbour Malden throughout this complaint

[2] From 1989 until 2014, Arbour Malden was the parent center for the other Arbour Counseling centers. However, on May 1, 2014, Arbour Woburn was issued a clinic license by DPH wherein Arbour Woburn was listed as the parent center for Arbour Fall River, Arbour Lowell, Arbour Franklin, Arbour Lawrence, Arbour Haverhill, Arbour Worcester, Arbour Allston, and Arbour West Yarmouth. Prior to Arbour Woburn's designation as the parent center, it was a satellite facility of Arbour Malden.

9.      To the best of the Relators' knowledge, for the purposes of 31 U.S.C.

§3730(e)(4), no public disclosure of the "allegations or transactions" that are the basis of

this action occurred prior to the Relators' filing of a qui tam action, *U.S. ex rel. Escobar v.*

*Universal Health Services, Inc.,* Civil action No. 11-11170-DPW in the United States

District Court for the District of Massachusetts on July 1, 2011.  Prior to the filing of that

action, the Relators voluntarily disclosed to the United States and the Commonwealth

of Massachusetts the allegations and transactions at issue in this case.   The Relators also

have knowledge that is independent of any such disclosure and which materially adds

to the publicly disclosed allegations or transactions.  Consequently, the Relators are the

original source of the information upon which the False Claims Act allegations in this

complaint are based.

10.      This Court has personal jurisdiction over the defendants, pursuant to 31

U.S.C. § 3732(a), because UHS operates mental health centers throughout Massachusetts

and, accordingly, transacts business in the District of Massachusetts.

11.      At all times relevant to this Complaint, UHS regularly conducted

substantial business within the District of Massachusetts and maintained employees

and offices in Massachusetts.  In addition, statutory violations, as alleged herein,

occurred in the District of Massachusetts.

## THE RELATIONSHIPS BETWEEN UNIVERSAL, UHS OF DELAWARE, INC. AND HRI, AND THEIR CONTROL OF ARBOUR

12.      Universal is a holding company which owns and operates health care

facilities, including behavioral health centers.  At the time Yarushka Rivera was treated

4

by Arbour, Universal owned, controlled, and operated 101 behavioral health centers in 32 states, the District of Columbia and Puerto Rico. At the time of the filing of this Complaint it owns, controls and operates at least 216 such centers.

13.     According to Universal's Form 10-K, filed with the United States Securities and Exchange Commission, UHS of Delaware, Inc. is the management company for Universal. Relators are not certain which responsibilities are lodged in Universal and which are held by UHS of Delaware, Inc., but between the two entities they manage and control all of the operating entities owned by Universal, including the Arbour facilities. UHS of Delaware, Inc. and Universal are collectively referred to herein as "UHS, Inc."

14.     UHS, Inc. holds all of its behavioral health centers through subsidiaries, such as HRI. However, notwithstanding the name of the entity which technically holds the license, all behavioral health center operations are managed by UHS, Inc. and all behavioral health centers, including the Arbour facilities, report to supervisors who are UHS, Inc. employees.

15.     In fact, all employees of the behavior health centers are hired by UHS, Inc. Persons interested in being employed in any UHS mental health facility, in any capacity — from the most credentialed treating professional to the lowest paid   , employee — either apply directly through the UHS, Inc., website or through third parties, such as Monster, who identify the employer as UHS, Inc. The same procedures apply to the Arbour facilities.

16.     Through its control of the human resources and the hiring process, UHS, Inc., sets the qualifications for each of the mental health professionals who treat patients at the behavioral health centers, including the Arbour facilities. Through its control of human resources, UHS, Inc. also establishes the lines of reporting and supervision at the behavioral health clinics, including the Arbour facilities.

17.     Each of the Arbour facilities identified above operates under a license granted by the Massachusetts Department of Public Health to Arbour Counseling Services. There is no corporation or other business entity recognized by the Commonwealth (or any other state) with the name Arbour Counseling Services.

18.     Notwithstanding the fact that it does not formally exist, Arbour Counseling Services purports to have a Chief Executive Officer. That CEO identifies his primary responsibilities to be achieving budget goals through sound cost management. Those budget goals were set and created by the officers and employees of UHS, Inc. Indeed, the Treasurer of HRI, Cheryl Ramagano, has certified to federal officials that the CEO of Arbour Counseling Services is an employee of UHS of Delaware, Inc.

19.     HRI asserts that it does business under the name of Arbour Counseling Services. However, HRI does not comply with the requirements of the Commonwealth of Massachusetts, as set forth in M.G.L c. 110, §§ 5 and 6, for doing business under another name. To the extent it has any operations, HRI only operates in Massachusetts. Yet HRI concedes that its principal place of business is in King of Prussia, PA, at the location of UHS, Inc.'s headquarters.

20.     HRI's president is Debra K. Osteen.  She also serves as a Director of HRI. Ms. Osteen is a Senior Vice President of Universal and the President of its Behavioral Health Division.  Ms. Osteen serves as the president of over 50 corporations affiliated with UHS, Inc.  She serves on the board of at least 30 corporations affiliated with UHS, Inc.  To the extent she devotes any time to HRI, it is de minimis.

21.     HRI's Treasurer is Cheryl Ramagano.  Ms. Ramagano is the Vice President and Treasurer of Universal.  Ms. Ramagano serves as the Treasurer to over 50 corporations affiliated with UHS, Inc.  To the extent she devotes any time to HRI, it is de minimis.

22.     HRI's Secretary is George Brunner, Jr.  He is a deputy general counsel of UHS, Inc.  Mr. Brunner serves as the secretary to over 20 corporations affiliated with UHS, Inc.  To the extent he devotes any time to HRI, it is de minimis.

23.     HRI's vice presidents are Steve Filton and Laurence Harrod, who are respectively the Senior Vice President and Chief Financial Officer of Universal, and the Vice President of Behavioral Finance of Universal.  Mr. Filton and Mr. Harrod also serve as directors of HRI.  Mr. Filton has served as a corporate officer of at least 100 other corporations affiliated with UHS, Inc. and Mr. Harrod serves as an officer of at least 30 corporations affiliated with UHS, Inc.  They each serve on the board of directors of more than a dozen corporations.  To the extent that either of them devote any time to HRI, it is de minimis.

24.     All of the officers and directors of HRI receive no compensation from HRI and devote all or almost all of their time to other UHS, Inc. entities.  HRI provides no

7

leadership or management of the Arbour facilities, including Arbour Lawrence.  All such management and control comes from employees of UHS, Inc.

25.     Through its control of HRI, and control over the employees, budgets and decision-making at each of the Arbour facilities — including its control of Arbour's personnel, supervision and financial decisions — UHS, Inc. is responsible for presentation of the Arbour claims to the United States and to the Commonwealth of Massachusetts.  To the extent UHS, Inc. did not present the false claims identified below to the United States and the Commonwealth of Massachusetts, UHS, Inc. caused the presentation of such claims.

26.     UHS, Inc. and HRI are jointly responsible for all of the obligations of UHS described herein.

## REGULATORY FRAMEWORK

### A.     MassHealth and Payment Systems for MassHealth Beneficiaries

27.     The Medicaid Program is a means-tested government entitlement program, jointly financed by the federal and state governments, that provides health care to low-income individuals.  Under Massachusetts General Laws Chapter 118E, the Executive Office of Health and Human Services administers the state's Medicaid program, known as MassHealth.  For most MassHealth beneficiaries, MassHealth provides primary health insurance coverage.  Some MassHealth beneficiaries, however, qualify for health insurance benefits under another health insurance plan, such as Medicare or a private insurance plan.   For these beneficiaries, MassHealth is secondary insurance, providing coverage for services not covered under their primary plan, or for

those who qualify, providing co-pay or deductible payments that would otherwise be due under the beneficiaries' primary health plan coverage.

28.    Under MassHealth regulations, all beneficiaries who receive primary health insurance coverage from MassHealth must enroll in some type of managed care program, either in the Managed Care Organization ("MCO") Plan or MassHealth's Primary Care Clinician ("PCC") Plan.  Both the MCO Plan and the PCC Plan provide mental health benefits to MassHealth beneficiaries.

29.    MassHealth beneficiaries enrolled in the MCO Plan must enroll in one of the MCOs approved by MassHealth.  The MCO chosen by the MassHealth beneficiary is responsible for delivering and paying for the members' health care services.  Once the beneficiary selects an MCO, the beneficiary must receive all healthcare from the providers within that MCO's network.  Each MCO has contracts with the medical and behavioral health services providers within its network, and all claims for the services provided to the MCO's MassHealth beneficiaries are presented to, and paid by, the MCOs.  The MCOs pay these claims with funds provided by MassHeath, pursuant to each MCO's contract with MassHealth.  MassHealth, in turn, receives its funding from Medicaid program funds it receives from the United States and the Commonwealth of Massachusetts.   Approximately 35%-50% of MassHealth beneficiaries were enrolled with a private MCO Plan during times relevant to this Complaint. Through MCO Plans, MassHealth pays for medical and behavioral health services on a capitated basis (a fixed monthly fee per beneficiary), and the MCOs ensure payment for beneficiaries' services.

9

30.     The PCC Plan administers non-behavioral health care on a fee-for-service basis. For behavioral healthcare services, however, the PCC Plan contracted with an MCO that specializes in the administration of mental health services, MBHP.  At the times relevant to this Complaint, approximately 20%-35%, were enrolled in the PCC Plan.

31.     Some MassHealth beneficiaries are not required to join a managed health program.  *See* 130 CMR 508.002.  These beneficiaries are frequently referred to as "fee-for-service" ("FFS") beneficiaries, and have their services paid for directly by the MassHealth on a FFS basis.  FFS beneficiaries include new MassHealth members who have not yet enrolled in a managed care plan, members who have Medicare (which covers 80% of health care costs), members with other primary health insurance coverage (e.g., employer-sponsored insurance), members who live in an institution, members who receive hospice care, and undocumented non-citizens, who are provided emergency medical services only.  *Id.*

32.     Approximately 30% of MassHealth beneficiaries are not enrolled in the PCC Plan or an MCO Plan.  However, because MassHealth does not provide primary health insurance coverage for most of these beneficiaries (or because their benefit s are statutorily curtailed), MassHealth spends significantly less than 30% of the amounts it pays for medical or mental healthcare services of this group of MassHealth beneficiaries.  For example, in 2015 MassHealth spent less than 5% of its annual budget on outpatient medical and behavioral health services for FFS beneficiaries.

10

MassHealth's spending for outpatient medical and behavioral health services for FFS beneficiaries remained at this low level for the relevant time period of this action.

**B.    Payment of Behavioral Health Services of MassHealth Beneficiaries Through Massachusetts Behavioral Health Partnership ("MBHP")**

33.    Since 1992, the Commonwealth has operated MassHealth under a section 1115 Demonstration waiver. Section 1115 of the Social Security Act gives the Secretary of Health and Human Services authority to approve experimental, pilot, or demonstration projects that promote the objectives of the Medicaid program. The 1992 waiver authorized a behavioral health care carve-out program for MassHealth recipients.

34.    Under this arrangement, which has been in effect for more than twenty years, behavioral health care services for MassHealth members are administered by an MCO. For MassHealth beneficiaries enrolled in the PPC Plan, mental health care claims are paid for and administered by a private contractor who enters into a written agreement with MassHealth. Since 1996, MBHP, a subsidiary of ValueOptions Inc., has served as the behavioral health vendor for MassHealth's PPC members. [3] ValueOptions Inc. merged with Beacon Health Holdings in December 2014. Both entities are independently operated subsidiaries of Beacon Health Options ("Beacon").

35.    MassHealth pays MBHP for each PCC member on a capitated basis from Medicaid program funds which MassHealth receives from the United States and the Commonwealth of Massachusetts.

---

[3] Most recently, in July 2017, the Executive Office of Health and Human Services and MBHP signed a new five-year contract to provide behavioral health service to MassHealth PCC members.

11

36.     For MassHealth members enrolled in the MCO Plan, MassHealth has

entered into a written contract with six MCOs for the provision of medical and mental

health care services: Boston Medical Center HealthNet Plan, Neighborhood Health

Plan, Tufts—Network Health, Fallon Community Health Plan, Health New England,

and CeltiCare.[4]

37.     In practice, the vast majority of MassHealth beneficiaries who receive

primary coverage from MassHealth have their behavioral health services paid for by

MBHP or its affiliate, Beacon. Just as MassHealth has contracted with MBHP to provide

and administer mental health care services for PCC Plan members, most of the MCOs

have contracted with MBHP's affiliate, Beacon, on a capitated basis to provide

behavioral health care services to MCO Plan members.[3] Thus, because all PPC Plan and

nearly all MCO Plan beneficiaries have their behavioral health care services paid for by

Beacon or MBHP, MBHP and its affiliates administer and pay for the behavioral health

care services of at least 60%-70% of MassHealth beneficiaries.

38.     For outpatient mental health clinics, such as the Arbour facilities, the

percentage of MassHealth claims paid by MBHP, Beacon and its affiliates is much

higher. With no inpatient or chronic behavioral health facilities, the only services the

---

[4] In addition to these six MCOs, during the relevant time period UHS contracted and submitted
behavioral health claims to five other MCOs (along with their affiliates) serving MassHealth members:
Commonwealth Care Alliance, CCA One Care, Senior Whole Health, Tufts Health Plan, and Evercare
(United Health Care). These plans serve discrete groups of beneficiaries, such as persons with
disabilities, seniors, and individuals eligible for expanded Medicaid coverage under the Affordable Care
Act.

[3] On information and belief, during all times relevant to this complaint, only one of the MCOs, Tufts—
Network Health, does *not* contract with MBHP for the payment of behavioral health care services of its
covered beneficiaries.

Arbour Clinics provided to MassHealth members that would be reimbursed on a FFS basis were services for those members enrolled in Medicare or otherwise had MassHealth as secondary coverage. Accordingly, the vast majority of behavioral health services of provided to MassHealth members at the Arbour clinics were reimbursed by MCOs, including MBHP.

## C.    MassHealth Regulations for Provision of Behavioral Health Services

39.    According to The Centers for Medicare & Medicaid Services ("CMS"), the federal agency that partners with the state governments to administer Medicaid to eligible beneficiaries, Medicaid strives to improve the quality of healthcare services delivered to program beneficiaries in a manner which prevents or minimizes harm to patients. CMS recognizes that communication and coordination between properly qualified healthcare providers is paramount to ensuring that quality health care is delivered safely to Medicaid beneficiaries.

40.    In accordance with this directive from CMS, the Massachusetts Medicaid program, MassHealth, promulgates regulations that govern a healthcare provider's interactions with the program. See generally, 130 CMR §401.401- 130 CMR §650.035. See also 42 U.S.C. §§1396 – 1396v. The MassHealth regulations that apply to mental health centers are set forth in Chapter 429.000 of MassHealth's provider regulations. The regulations set forth in Chapter 429.000 establish "requirements for participation of mental health centers," see, § 429.401, regardless of whether such mental health services are paid directly by MassHealth or paid through a contractor, such as MBHP or one of

13

the MCOs.  Accordingly, these requirements apply equally to claims presented to MassHealth, MBHP or an MCO.

41.     It is axiomatic that a mental health center's ability to deliver safe, quality health care to patients depends upon the facility's mental health care professionals obtaining the proper qualifications for their particular profession and providing supervision to other health care providers who administer services to patients. Requiring practitioners who provide mental health services to MassHealth beneficiaries to have minimum qualification and supervision requirements is critical to ensuring that MassHealth members receive services of the requisite quality.  Unless practitioners meet the minimum training, experience and supervision requirements, MassHealth does not receive the benefit of its bargain — it cannot be certain that its members are being treated by individuals with the requisite qualifications to provide services that will actually assist its beneficiaries.  MassHealth has a vital state interest in ensuring that its members are not treated by charlatans or mountebanks, and that government funds are not wasted by payments to incompetent practitioners.

42.     Section 429.424 sets forth the professional qualification and supervision requirements for psychiatrists, psychologists, social workers, and psychiatric nurses working in a mental health center.  Indeed, having properly qualified and licensed health care professionals who communicate with and supervise staff in administering health care services to patients is so integral to MassHealth's ability to deliver quality care to patients while minimizing patient harm, that the agency conditions a mental health center's ability to receive payment on compliance with these regulations: "[t]he

14

MassHealth agency pays for diagnostic and treatment services only when a professional staff member, as defined by 130 CMR §429.424, personally provides these services to the member or the member's family." §429.441(A). Similarly, the title of § 429.424 makes it clear that professional staff who fail to meet the qualifications requirements set forth therein are not "authorized to render billable mental health center services."[6]

43.     Thus, MassHealth through its formal regulations has made it plain that compliance with the qualifications requirements established by § 429.424 is material to its payment decision-the regulations forbid reimbursement for services provided by personnel who fail to meet these requirements.   Further, because these requirements are mandatory for participation in MassHealth, such requirements are also material to the payment decision of any person with whom MassHealth has contracted to administer claims presented by mental health centers, including MBHP and the MCOs.

44.     The regulations require a mental health center to have at least one psychiatrist who is "currently...certified by the American Board of Psychiatry and Neurology, or the American Osteopathic Board of Neurology and Psychiatry, [or] be eligible and applying for such certification."  §429.424(A)(1).  Any additional psychiatrists employed by the mental health center "must be, at a minimum, licensed physicians in their second year of a psychiatric residency program accredited by the Council on Medical Education of the American Medical Association." §429.424(A)(2).

---

[6] The title of Section 429.424 was amended in 2014 to include the language that that professional staff must meet the qualification requirement to be authorized "to render billable mental health center services.  Before that however, the definitions of the service codes for individual, family and group therapy (90806, 90847 and 90853) expressly required the service provider to have met the requirements of § 429.424.  The 2014 amendment merely codified the administrative requirement that was already known and in effect.

Such physicians must be under the supervision of a fully qualified psychiatrist, as articulated in §429.424(A)(1).

45.     The regulations also set forth minimum requirements for psychologists. Section 429.424(B)(1) requires at least one staff psychologist to be licensed by the Massachusetts Board of Registration of Psychologists and specialize in clinical or counseling psychology, or a closely related specialty. All staff psychologists are required to have obtained a master's degree (or the equivalent) in clinical or counseling psychology from an accredited institution and either be currently enrolled in or have completed a recognized doctoral program. 130 CMR § 429.424(B)(2). The regulations further state that "[a]ll services provided by such additional staff [psychologists] must be under the direct and continuing supervision of a psychologist meeting the requirements set forth in 130 CMR 429.424(B)(1)."

46.     The credentials and qualifications psychiatric nurses are required to possess before a mental health center may bill for services rendered are also set forth at § 429.424. The regulations state that "[a]t least one psychiatric nurse must be currently registered by the Massachusetts Board of Registration in Nursing and must have a master's degree in nursing from an accredited National League of Nursing graduate school with two years of full-time supervised clinical experience in multidisciplinary mental-health setting and be eligible for certification as a clinical specialist in psychiatric/mental-health nursing by the American Nursing Association." §429.424(D). A psychiatric clinical nurse specialist – a licensed registered nurse authorized to practice in an expanded role – "can perform prescribing duties within their scope of

16

practice." §429.424(E). The regulations also state that psychiatric nurses must meet the requirements set forth in 244 CMR 4.05(4), which states that such nurses must be under the direct supervision of a physician.

47.     Regarding social workers, the regulations state that "[a]t least one staff social worker must have received a master's degree in social work from an accredited educational institution and must have had at least two years of full-time supervised clinical experience subsequent to obtaining a master's degree." §429.424(C)(1). "Any additional social workers on the staff must provide services under the direct and continuous supervision of an independent clinical social worker." §429.424(C)(2). All unlicensed counselors "must be under the direct and continuous supervision of a fully qualified professional staff member." §429.424(F)(1). All counselors must hold a master's degree in counseling education, counseling psychology, or rehabilitation counseling from an accredited educational institution and must have had two years of full-time supervised clinical experience in a multidisciplinary mental-health setting subsequent to obtaining the master's degree. § 429.424(F)(2).

48.     The composition of a mental health center's professional staff is an important part of the center's ability to deliver safe, quality care to patients. The regulations, therefore, require a mental health center like UHS's Arbour facility to have a balanced interdisciplinary staff including professional staff members who meet the qualifications discussed above. One of these staff members must be a psychiatrist and two must be from non-physician disciplines including psychology, social work, or psychiatric nursing. §429.422(A). The regulations state that the staff "must have

17

specific training and experience to treat the target populations of the center." For example, staff members administering services to children "are required to have specialized training and experience in children's services." §429.422(B).

49.     To further ensure that quality care is delivered to MassHealth beneficiaries by professionally supervised staff, the regulations require a mental health center to appoint a medical director and a clinical director. Section 429.422(A) provides that a mental health center must have at least one psychiatrist "who meet[s] the qualifications outlined in 130 CMR 429.424" as the center's medical director. The medical director is "responsible for establishing all medical policies and protocols and for supervising all medical services provided by the staff." §429.423(C).

50.     All mental health centers must also employ a director of clinical services who is responsible for the direction and control of all professional staff members and services. §429.423(B). The clinical director is "responsible for ensuring compliance of the satellite program with the regulations in 130 CMR 429.000." §429.439(A)(1). Additionally, the clinical director is responsible for the selection of clinical staff, accountability for adequacy and appropriateness of patient care, the establishment of policies and procedures for patient care, program evaluation, and the establishment of a quality management program. §429.423(B). The clinical director must ensure appropriate supervision of staff, §429.423(B)(2)(c), and must retain adequate psychiatric staff. §429.423(B)(2)(e). Section 429.439 states that a satellite facility's clinical director must "meet all of the requirements in 130 CMR 429.423(B)."

18

51.     Section 429.439 expressly provides that satisfaction of the clinical director's responsibilities is a prerequisite to payment under Medicaid: "[s]ervices provided by a satellite program are reimbursable only if the program meets the standards described below [in subsections (A) through (D)]."

52.     Other Chapter 429.000 regulations reiterate the requirement that mental health facilities use qualified and properly supervised staff.  Section 429.421(A)(2) provides that "[all] services must be…delivered by qualified staff in accordance with 130 CMR 429.424."  Section 429.438(E) provides that mental health centers must supervise staff members "within the context of a formalized relationship," that such supervision must be "appropriate to the person's skills and level of professional development" and consistent with applicable professional licensing standards. §429.438(E)(1)-(2).  And §429.408(C) expressly states that Medicaid payment for mental health services includes payment for supervision.

53.     All of the regulations discussed above apply to both "parent centers," which are defined as "the central location of the mental health center," and "satellite facilities" like UHS's Arbour clinic, which is "a mental health center program at a different location from the parent center that operates under the license of and falls under the fiscal, administrative, and personal management of the parent center." §429.402.  Satellite facilities are further defined as either "autonomous", those that have "sufficient staff and services to substantially assume [their] own clinical management," or "dependent," satellite facilities that operate "under the direct clinical management of the parent center."  §429.402.

19

54.     Massachusetts regulations do not distinguish between beneficiaries that receive benefits via MassHealth fee-for-service, or through contracting entities, such as MBHP and the various MCOs — all beneficiaries are considered MassHealth members. 130 CMR § 450.101. Thus, all claims submitted on behalf of any MassHealth beneficiary must comply with State Medicaid regulations.

**D.     Other Massachusetts Agency Regulations**

55.     Numerous other agencies in the Commonwealth promulgate regulations which stress the importance of having qualified professionals and staff supervision in mental health centers. Massachusetts' Department of Public Health ("DPH"), which licenses and regulates mental health facilities, emphasizes the critical importance of appropriate staff supervision. DPH regulations provide that case consultation, psychotherapy, and counseling services provided at such clinics must be supervised "by the mental health professionals identified in 105 CMR 140.530(C)." §140.520(D)(1). Section 140.530(C), in turn, requires that every satellite facility have a board-certified or board-eligible psychiatrist on staff – "[a] satellite clinic must meet, independently of its parent clinic, all the requirements imposed on clinics by 105 CMR 140.000." The psychiatrist is also responsible for the prescribing, monitoring, and supervising of all prescribed medications, the clinical supervision of appropriate staff, and the documentation of such supervision. §140.530(D)(E); §429.423(D)(2)(f). Section 140.530(E) further provides that unlicensed staff members must be clinically supervised on a regular basis by professional staff members as defined in §140.530(E).

20

56.     Massachusetts regulations relating to the standards of professional practice and conduct in social work are set forth at 258 CMR §20 et seq.  The regulations state that it is "unethical or unprofessional conduct" to authorize or permit "a person to perform functions or services which constitute the practice of social work…when one knows or has reason to know that said person is not licensed by the Board and that a license is required" to perform the services rendered.  258 CMR §20.01(5).  Section 20.01(6) further states that it is unethical to allow a licensed social worker to perform a particular service when one knows, or has reason to know, that the performance of that service "exceeds the legally permissible scope of practice for that level of licensure." The regulations also make it unethical to engage in any course of conduct which is prohibited by any provisions of the Code of Ethics of the National Association of Social Workers.  258 CMR §20.01(10).  Section 20.03 also forbids a social worker from performing any service which "exceeds the legally permissible scope of practice for his licensure."

57.     Regulations propounded by the Board of Registration in Medicine regarding licensing and the practice of medicine are set forth at 243 CMR §2.00.  The purpose of the regulations is to set standards which promote public health and safety in the practice of medicine.  These regulations discuss the appropriate supervision of nurses prescribing medication at 243 CMR §2.10(3), requiring a board certified or board eligible psychiatrist with admitting privileges to supervise a psychiatric nurse who is prescribing medication.  The supervising physician shall also review the nurse's prescribing practice and provide ongoing direction regarding that practice.  243 CMR

21

§2.10(4).  The Board of Registration in Nursing regulations are set forth at 244 CMR 4.00 and also set forth the requirements for a physician supervising a psychiatric clinical nurse.

58.     Regulations of the Department of Public Health, governing the management and operation of a Mental Health Center regardless of payment source, provide that all care providers must be clinically supervised on a regular basis by professional staff members and that the documentation of supervision must be available for review.  See 105 CMR §140.530(E).  Irrespective of whether a mental health center is "dependent" on a parent or "autonomous" of the parent, however, appropriate supervision is an express material pre-condition that must be satisfied before a Mental Health Center can seek reimbursement from MassHealth.  See 130 CMR §429.439.

**E.     MBHP and MCOs Licensing and Supervision Requirements Through Credentialing**

59.     Although MassHealth establishes qualifications, licensing and supervision requirements for professional staff at mental health centers, such as the Arbour facilities, it does not conduct individual reviews of each and every staff member to ensure they have met the requirements of Section 429.424.  MassHealth places the responsibility on the mental health centers to ensure that their staff members who provide billable services meet the requirements, and in particular, the regulations place this responsibility on the mental health center's Director of Clinical Services, *see* 130 C.M.R. §429.423(B)(2).

22

60.     MBHP and the MCOs take a more pro-active approach in ensuring that all practitioners who provide billable mental health services to MassHealth members are qualified, licensed, and properly supervised.  They require the mental health centers to actively investigate whether their staff has the minimum qualifications for providing mental health services and to make explicit certifications for each and every practitioner that the relevant qualification requirements have been met.  Only if the mental health facility makes the appropriate certifications — which must be reaffirmed every three years — will MBHP and the MCOs accept claims based for services provided by the practitioner.  If, in fact, MBHP and the MCOs pays claims for services provided by a practitioner who does not meet the requirements of §429.424 (or the other licensure, qualification or supervision requirements) it is only because the mental health clinic has either made a deliberate false statement or because it has provided certifications in reckless disregard of the truth or falsity of statements.

61.     Similar to MassHealth, MBHP will not pay claims presented by a provider who is not qualified to participate in the MassHealth program.   Many mental health service claims, however, are submitted by mental health centers, which are usually corporate entities.  In these cases, the named provider does not actually perform the service — the reimbursable service is performed by a mental healthcare professional who is an employee or a contractor.  MBHP has a formal credentialing process to make sure that the individuals who actually perform the billable work are qualified to provide such services.

23

62.    As part of this credentialing process, Arbour and other mental health center providers make attestations to MBHP that the individuals who actually perform the billable services are able to perform essential functions of their position or operational status. Arbour and other providers make attestations to MBHP that individual practitioners:

- Are able to practice independently in his/her specialty, with clinical privileges in good standing at the institution designated as the primary admitting facility;

- Graduated from an *accredited* professional school and/or highest training program applicable to the academic degree, discipline or licensure;

- Meet the minimum hours of clinical experience as defined by the state licensing board, and, if applicable, meet the minimum supervision requirements of MassHealth under an approved supervisor;

- Have appropriate work history for the practitioner's specialty, specialty board certification, if indicated, and current specialized training for certain levels of specialty care; and

- Are not excluded or sanctioned by government-sponsored health benefit programs, such as MassHealth.

63.    MBHP performs a re-credentialing process with all providers, including Arbour, at least as frequently as every three years. The attestations referenced in the preceding paragraph must be reaffirmed for each and every practitioner in every re-credentialing process.

24

64.     MBHP requires providers, such as Arbour, to update MBHP within no more than 10 days if there are "material" changes in credentialing or re-credentialing applications, expressly including "any action against licenses, certifications, registrations, and/or accreditation status." MBHP will terminate network participation for failing to comply with its credentialing update requirements.

65.     For entities the size of UHS, MBHP assigns credentialing and re-credentialing responsibilities to the facility.  MBHP requires all credentialed professionals to meet all applicable laws, rules and regulations (state and federal), all accreditation standards, and all client and/or government program-specific requirements, including MassHealth regulations.

66.     Organizational providers such as Arbour must ensure that employees and contractors serving MassHealth beneficiaries not only meet MassHealth's supervision, licensure and qualifications requirements, but relevant MBHP and MCO credentialing criteria, which are stricter.  To be credentialed to provide services in a particular profession, MBHP and MCOs require that individual practitioners have current, valid, unrestricted licenses to practice in the profession that require licensure in the Commonwealth of Massachusetts.

67.     MBHP provides a very limited exception to its licensing requirements to three types of providers, psychology interns, social work interns and mental health counselor interns.  MBHP's intern licensing exceptions **only apply to interns who are supervised by eligible, licensed individuals, and who receive a minimum of two hours a week of direct supervision** (one hour face to face, individual supervision, and

25

one hour of either individual or group supervision).  Such supervision must be documented in files accessible for review by MBHP.  Psychology interns must be supervised by a licensed psychologist; social work interns must be supervised by a Licensed Independent Clinical Social Worker; and mental health counselor interns must be supervised by a Licensed Mental Health Counselor, a Licensed Independent Clinical Social Worker, a licensed, psychologist, a licensed, master's-level clinical nurse specialist, or a licensed psychiatrist.  MBHP also strictly defines who is an "intern" for the purpose of its licensing exception.  A psychologist, social worker or mental health counselor who is unable to pass, or unwilling to take, the professional licensing exam for his or her specialty is not considered an "intern" and consequently cannot bill MBHP for services.

68.    MBHP's credentialing requirements also mandate that if a MassHealth beneficiary's case is assigned to an intern, the beneficiary must be informed of the intern's status and that the beneficiary can request and receive, without prejudice, a reassignment to a clinician who is not an intern. Failure to inform a beneficiary that their clinician is an intern may result in termination.

69.    In its contracts with MBHP (and its contract with the MCOs), Arbour has agreed that MBHP (and the MCOs) may impose sanctions (including suspension and termination of network participation) for credentialing/re-credentialing failures, and for professional competency and/or conduct issues; quality of care concerns/issues; and for violations of state or federal laws, rules, or regulations.

26

70.     The credentialing requirements described above apply to claims made on behalf of PPC Plan members, whose mental health benefits MBHP manages. However, virtually the same credentialing requirements apply to claims made on behalf of almost all MassHealth beneficiaries enrolled in the MCO Plan because MBHP and Beacon have nearly identical credentialing criteria. As discussed above, both MBHP and Beacon are subsidiaries of Beacon Health Holdings,[7] and, with the exception of the Tufts-Network Health Plan,[8] all of the MCOs contract out the management of their behavioral healthcare services to Beacon.

71.     Beacon, like MBHP, has a credentialing process for all mental health care practitioners. UHS can only receive reimbursement for services provided to MCO beneficiaries if the practitioner who provided the services meets Beacon's credentialing criteria. All providers, including Arbour, make attestations to Beacon that individual practitioners graduated from an accredited professional school, are licensed (or eligible to receive a license), are not excluded or sanctioned by government-sponsored health benefit program, and have documented clinical supervision under an approved supervisor as defined by MassHealth regulations.

72.     As with MBHP, Beacon, on behalf of the MCOs, requires a re-credentialing process by all providers, including UHS, at least as frequently as every three years. The necessary attestations referenced in the proceeding paragraphs must

---

[7] Even before MBHP's parent corporation merged with Beacon, the credentialing standards employed by MBHP and the Beacon entities were substantially similar. Both organizations employed a credentialing model widely adopted within the industry which was the industry standard. When the organizations merged, their credentialing models did not change significantly

[8] Although Tufts – Network Health does not utilize Beacon as a contractor for its behavioral healthcare services, its credentialing criteria is nearly identical to that used by Beacon.

27

be reaffirmed for each and every practitioner in every re-credentialing process. As with MBHP, Beacon, on behalf of the MCOs, requires all practitioners to be independently licensed in their professions, with limited exceptions for certain types of interns. Beacon's credentialing process, like MBHP's, is stricter than the licensing, qualifications and supervision requirements under MassHealth's regulations. Not all mental health care practitioners who are allowed to bill MassHealth are qualified to receive reimbursement under MBHP's or the MCOs' credentialing requirements. However, no one who does not meet the minimum MassHealth licensing, qualifications or supervision requirements for submitting bills is qualified to perform services that will be reimbursed by MBHP or the MCOs.

73.    The credentialing process established by MBHP and the MCOs establishes that compliance with MassHealth's minimum qualifications, licensure and supervision requirements is material to MBHP's and the MCOs' payment decisions. MBHP and the MCOs would not have established and enforced the elaborate credentials requirement if they did not intend to enforce the requirement that MassHealth funds will only be used to pay for services performed by a qualified practitioner. If the provider performs the credentialing process in good faith, mental health practitioners who do not meet MassHealth's minimum qualifications will be identified, and neither MBHP nor the MCOs will knowingly pay for claims for those practitioners' services.

F.     **Claims Submission to MBHP and MCOs**

74.    For the submission of claims to MBHP and MCOs, Arbour specifically agreed by contract that supervising clinicians should not submit claims in their name,

and that no participating provider should submit claims in their name for services that were provided by another individual provider.

75.     By contract with Arbour, MBHP and MCOs required certain data from Arbour for every claim for payment for a MassHealth member, including:

- Data about the facility, including address;

- Data about the type of bill to be submitted (including inpatient/outpatient, type of facility, type of care, and sequence of the bill for a specific episode of care);

- Data about the patient, including name, address, date of birth, and sex;

- Data about the service provided, including admission and discharge date and hour, priority (type) of visit, source of referral, discharge status;

- Total charges for the service(s) provided;

- For the service provider, name and one form of identifier, either an NPI number or a non-NPI number (as explained below), which may include a state license number or a type of commercial number; and

76.     Individual claims do not necessarily bear the NPI numbers[9] of individual practitioners; instead, MBHP and parent company Beacon assign providers unique six digit numbers.  Such numbers are assigned after MBHP and Beacon review the credentialing information provided for each practitioner and has verified that the practitioner meets the qualifications and credentialing requirements.  MBHP and MCOs

---

[9] An NPI is a unique 10-digit identification number which is issued to health care providers in the United States by the Centers for Medicare and Medicaid Services ("CMS").  The NPI is used to identify health-care providers for billing purposes in all HIPAA transactions, and, as of May 23, 2007, all paper and electronic claims submitted to MassHealth must contain an NPI.

29

rely on the credentialing information submitted by providers like Arbour in processing subsequent claims for payment submitted on behalf of these providers.  Neither MBHP nor the MCOs will knowingly provide a unique identifying number to a practitioner who does not meet MassHealth's minimum licensure, qualification or supervision requirements.

**G.     MassHealth and Other Massachusetts Regulations for Provision of Behavioral Health Services Apply to Services Paid for by MBHP and MCOs**

77.     Mental health care providers such as UHS contract with MBHP and the various MCOs, and are compensated by those entities for the mental health services they provide to MassHealth members.  MBHP and the MCOs pay these providers with funds that have been provided to them by the United States and the Commonwealth through the Massachusetts Medicaid Program.  Consequently, any request for payment made to MBHP or an MCO on account of any services provided to a MassHealth member is a "claim" for the purpose of 31 U.S.C §§ 3729 and 3730 and M.G.L. c. 12, §§ 5B and 5C.  Any presentation of a false or fraudulent request or demand for payment to these entities is a "false claim" as defined by those statutes.  Any reference to any of the Defendants presenting claims or causing claims to be presented to MassHealth shall include the presentation of claims and the causing of claims to be presented to MBHP or to an MCO that has contracted with MassHealth.

78.     Pursuant to all provider agreements between MBHP (or the various MCOs) and mental health care providers, including the agreements with all UHS entities, the provider must comply with all state and federal regulatory requirements.

See 130 C.M.R. §450.223 (C)(1); 42 CFR § 438.214. All conditions of payment under MassHealth regulations, policies and practices are conditions of payment under any provider contracts with MBHP or with an MCO.

79.     Moreover, by contract, MBHP and MCOs expressly provided with Arbour that Arbour had a responsibility to comply "with all applicable state and/or federal laws, rules, and/or regulations," including those requiring licensure and certification related to the provision of mental health services. Arbour agreed with MBHP and MCOs it was the responsibility of Arbour to ensure that it complied with the "professional and legal requirements" within Massachusetts, and that Arbour would be in compliance with "all applicable statutes, regulations, rules, and directives of federal, state, and other governmental regulatory bodies having jurisdiction over it or the provisions of services," as required for MassHealth members.

80.     The general credentialing requirements of MBHP and MCOs expressly condition providers' eligibility for participation in its network on conforming to "all applicable licensing, certification, or other professional standards as set forth in applicable state and federal laws and regulations." *See also* 130 CMR §450.223(C)(1). Through credentialing, MBHP and MCOs ensure that MassHealth beneficiaries receive safe and adequate mental healthcare services performed by qualified and licensed clinicians.

**H.     MassHealth Service Codes and Descriptions**

81.     Claims submitted to MBHP and to the MCOs must also include diagnosis and procedure codes, including Current Procedural Terminology ("CPT") codes. The

31

CPT system, developed by the American Medical Association, is designed to provide information about services provided for financial and administrative purposes. CPT codes play an important part in the billing process as they identify for the insurance payer the services for which the healthcare provider seeks reimbursement. MassHealth uses the CPT coding system for health services performed by mental health clinicians or other qualified health care practitioners, however, at relevant times, MassHealth adopted definitions for service codes that were unique to the Commonwealth.

82.    Section 601 of the Mental Health Center Manual sets forth CPT codes which correspond to particular mental health services. Each mental health service is described and the assigned code is used by providers to bill MassHealth for the service. Section 601 is clear that reimbursement is contingent on compliance with the MassHealth regulations discussed above as the Section states: "MassHealth pays for services represented by the codes listed in Subchapter 6 in effect at the time of service, subject to all conditions and limitations in MassHealth regulations at 130 CMR 429.000 and 450.000."

83.    The claims UHS submitted to MassHealth, MBHP and MCOs contained the CPT codes which identified the services for which UHS sought reimbursement. MassHealth's definitions of the relevant CPT codes not only identify which services UHS represented it had provided, but also define what MassHealth (or MBHP, or an MCO) expected to receive in exchange for reimbursement. The majority of the relevant claims bore CPT codes 90806, 90847, 90853, 90801, 90804, 90832, and 90834, which corresponded to the provision of individual therapy, family therapy, group therapy,

32

psychiatric diagnostic interview examination, and individual psychotherapy

respectively.  The definition of these codes also underscores the importance MassHealth

placed on compliance with the requirements of § 429.424.  At relevant times, Section 601

of the MassHealth Mental Health Center Manual defined these codes as follows:[10]

90806:      Individual psychotherapy, insight oriented, behavior modifying and/or
            supportive, in an office or outpatient facility, approximately 45 to 50
            minutes face-to-face with the patient (by professional staff member as
            defined in 130 CMR 429.424).

90847:       Family psychotherapy (conjoint psychotherapy) (with patient present)
            (by professional staff member as defined in 130 CMR 429.424).

90853:      Group psychotherapy (other than of a multiple-family group) (by
            professional staff member as defined in130 CMR 429.424).[11]

90801:      Psychiatric Diagnostic Interview Exam.

90804:      Individual psychotherapy, insight oriented, behavior modifying and/or
            supportive, in an office or outpatient facility, approximately 20 to 30
            minutes face to face with the patient.

90832:      Psychotherapy, 30 minutes with patient and/or family member.

90834:      Psychotherapy, 45 minutes with patient and/or family member.

## FACTUAL ALLEGATIONS[12]

84.      UHS is America's largest psychiatric chain and operates more than 200

psychiatric facilities across the country.  UHS treated nearly 450,000 patients last year

---

[10] This list is not exhaustive, but representative of the types of services and codes for which counseling
was billed to MassHealth.
[11] The parenthetical in CPT Codes 90806, 90847 and 90853  requiring such services to be performed "by a
professional staff member as defined in 130 CMR 429.424" was removed in April 2014.  At the same time,
130 C.M.R. § 429.424 was amended to make it clear that only practitioners who met the qualifications
requirements establish in that section were authorized to render billable mental health center services, so
the language in the parenthetical was superfluous.  *See*, fn. 5 *supra.*
[12] A copy of Yarushka Rivera's medical records documenting her treatment at Arbour Lawrence are
attached at Exhibit 1.

alone and more than a third of the company's yearly revenue, which totals in the billions of dollars, is generated from Medicare and Medicaid patients. UHS, however, has embraced a corporate culture that puts profits ahead of patients. Numerous reports have surfaced in at least a dozen states that UHS has engaged in a pattern of healthcare fraud that has placed patients in harm's way. A 2011 report on one of UHS's Chicago hospitals revealed that UHS had "woefully inadequate" staffing and that UHS's failure to adequately train staff at the hospital was "repeated and willful…in an effort to maximize financial profits." In early 2015 it was revealed that UHS was under investigation by the U.S. Department of Justice Criminal Fraud Section. The investigation focused on whether the company had fraudulently billed Medicare and Medicaid for behavioral health services provided to its patients. More than twenty-five UHS facilities are currently under federal investigation including multiple facilities in Florida, Georgia, Illinois, North Carolina, Pennsylvania, Texas, Utah, and Virginia. Despite the ever-widening investigation into UHS, the company continues to see admissions to its facilities steadily increase.

85.     During the relevant period, all of the Arbour Clinics treated MassHealth members and a high proportion of each clinic's patient visits (and each clinic's revenue) was due to treatment of MassHealth members. According to the Commonwealth between 2005 through 2013, the revenue each Arbour Clinic received directly from MassHealth and from MBHP on account of their treatment of MassHealth members was as follows:

Arbour Allston                    $ 7,586,450

| | |
|---|---|
| Arbour Franklin | $ 4,874,590 |
| Arbour Haverhill | $ 3,782,869 |
| Arbour Lawrence | $ 10,679712 |
| Arbour Lowell | $ 5,314,685 |
| Arbour Malden | $ 12,277,457 |
| Arbour Norwell | $ 10,922,822 |
| Arbour Woburn | $ 5,841,181 |
| Arbour Worcester | $ 3,668,030 |
| Arbour Fall River | $ 8,281,579 |

Additionally, the Arbour clinics received an additional $20,918,317 from various MCOs for mental health treatment provided to MassHealth members. In total, during this period, the Arbour clinics presented claims (and received payments) in excess of $94,000,000 for providing counseling and medication management to MassHealth members.

86.   Relators became aware of UHS's fraudulent activities in Massachusetts as a result of treatment their daughter Yarushka received at UHS's Arbour Lawrence clinic. Yarushka, a recipient of MassHealth insurance benefits, was first referred for mental health care at Arbour Lawrence in 2004, after she began experiencing behavioral problems at her middle school. Yarushka received counseling at Arbour Lawrence with Anna Cabacoff, a licensed social worker.

87.   In late 2007, however, Relators were informed by Edward Keohan, Arbour Lawrence's clinical director, that Yarushka needed to be in group therapy with other children and he transferred her care to Maria Pereyra, who referred to herself as a "social worker." In November 2007, Yarushka began receiving "Group Therapy" counseling with Pereyra. After several group therapy sessions with Pereyra, and

35

approximately fifteen other patients, Yarushka complained that she was not benefiting from the counseling.

88.     Relators met with Keohan, Pereyra's supervisor, and informed him that they were concerned about the care Yarushka was receiving from Pereyra. Keohan told the Relators that they should give Pereyra some more time working with Yarushka and that Pereyra would provide individual counseling for Yarushka rather than treating her as part of a group. Relators and Yarushka agreed with Keohan's recommendation and Yarushka continued to be treated by Pereyra, but on an individual basis.

89.     Unfortunately, Yarushka did not improve. Relators again contacted Keohan and expressed their concerns regarding Pereyra's treatment of Yarushka and stated that they would like Yarushka's care to be transferred. At Relators' request, Keohan transferred Yarushka's care to Diana Casado. Like Pereyra, Casado also referred to herself as a social worker. She treated Yarushka both in group therapy and on an individual basis from June 2008 through September 2008.

90.     Unbeknownst to Relators, neither Pereyra nor Casado were social workers as they had claimed to be. Furthermore, neither had any professional licensure that would allow them to provide mental health counseling to children such as Yarushka, without appropriate supervision. Neither Keohan, nor any other licensed social worker, provided any supervision of Pereyra or Casado which was required, given their unlicensed status.

91.     By February 2009, it was clear to Relators that neither Pereyra nor Casado had benefited Yarushka, and Relators asked Keohan to transfer Yarushka's care.

36

Keohan informed Relators that he was going to reassign Yarushka's care to Anna Fuchu, who Keohan represented was a very experienced "doctor" who could help Yarushka.  Fuchu told Yarushka and the Relators that she was a "psychologist," had obtained a Ph.D., and referred to herself as "Dr. Fuchu."  On February 25, 2009, Fuchu met with Yarushka and conducted an Initial Clinical Evaluation that lasted approximately fifteen minutes.  Based on this evaluation, Fuchu formally diagnosed Yarushka as suffering from bipolar disorder, the first time Yarushka had been so diagnosed.

92.     Fuchu provided individual therapy to Yarushka as well as family therapy to Yarushka and her family throughout 2009.  Relators would later learn, however, that Fuchu was not a psychologist and that her application for licensure as such had been denied by the Massachusetts Board of Registration for Psychologists.  Relators would also learn that Fuchu was not supervised by a certified psychologist and that the Arbour clinic did not even employee a certified psychologist who was qualified to supervise.

93.     In May of 2009, Relators were again contacted by school officials and were informed that Yarushka was having trouble interacting with other students at school and would need to be seen by a psychiatrist before she could be readmitted.  Relators told Fuchu of the school's recommendation and Fuchu referred Yarushka to Maribel Ortiz of Arbour Lawrence.  Because they had specifically informed Fuchu that Yarushka needed to be seen by a psychiatrist, and Fuchu referred Yarushka to Ortiz, Relators believed Ortiz was, in fact, a psychiatrist and referred to her as "Dr. Ortiz."

37